**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:13-CR-144-FDW-DSC**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND RECOMMENDATION** |
| | ) | |
| **COLBY JAMAL FAULKNER,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

THIS MATTER is before the Court on the Defendant's "Motion to Suppress Evidence Statements," Doc. 9, filed on September 8, 2013. The "Government's Response To Defendant's Motion to Suppress Evidence," Doc. 10, was filed on September 19, 2013. The Court conducted an evidentiary hearing on October 9, 2013. On October 16, 2013, the Government filed its "Government's Supplemental Response to Defendant's Motion to Suppress Evidence," Doc. 11. Defendant did not file a supplemental brief. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1), and the Motion is now ripe for consideration.

Having fully considered the record and following an evidentiary hearing, the undersigned respectfully recommends that Defendant's Motion to Suppress be <u>granted in part</u> and <u>denied in part</u>, as discussed below.

## I. FACTUAL BACKGROUND AND FINDINGS

Defendant is charged in a one-count Bill of Indictment with possession of firearm by felon in violation of 18 U.S.C. § 922(g). During the hearing, the Court heard testimony from Charlotte Mecklenburg Police ("CMPD") Officers Paul Arpino, Kelly Thomas, and Chris Rains.

1

The Defendant also testified. The Court also viewed the video captured by the Digital Mobile Video Recorder ("DMVR") located in one of the police vehicles.

On November 17, 2012, Officer Arpino was on patrol in west Charlotte along with his partner, Officer Bignall. The officers are part of a "Focus Mission Team." This team conducts street level interdiction of violent crimes and drug offenses. At 12:23 a.m., Officer Arpino observed a 1994 Honda Accord parked at a Red Roof Inn located at 3325 Queen City Drive. There were two occupants in the Honda. Officer Arpino knew that larceny from automobiles, robberies, prostitution, and drug transactions were common in this area. Officer Arpino approached the Honda to initiate a voluntary contact with the occupants, given the late hour and the crimes prevalent in the area. Officer Bignall parked their police vehicle perpendicular and to the side of the Honda. Officer Arpino approached the driver of the Honda, explained why police were in the area, and requested identification. The driver, identified as "Williams," produced an operator's license.

As he spoke with Williams, Officer Arpino shined his flashlight into the vehicle. He observed a plastic baggie corner on the left rear passenger floorboard. In his training and experience, the baggie corner appeared to be drug paraphernalia. Defendant was in the front passenger seat. Officer Arpino noticed that he appeared nervous and was breathing heavily.

Officers Thomas and Rains arrived as back-ups. Their vehicle was parked perpendicular to the Honda and behind Officer Arpino's police vehicle. Officer Arpino ordered Williams out of the vehicle. He directed the other officers to have Defendant exit the vehicle. As the car doors opened, the officers detected a strong odor of marijuana. Officers Thomas and Rains observed Defendant leaning forward and pressing his hand against his thigh. As Defendant

2

exited the car, he continued to lean forward and press his hand against his thigh. Officer Rains became concerned that Defendant was attempting to conceal a weapon or some contraband. Officer Rains placed Defendant's hands behind his back and handcuffed him. Officer Rains asked Defendant, "Where is the marijuana?" Defendant stated, "I have a gun in my pocket." Officer Rains asked which pocket contained the gun, and Defendant answered it was in his right pocket. Officer Rains removed a Sig Sauer handgun from Defendant's right pocket. Defendant volunteered, "I just bought it today." Officer Rains also located a bag of suspected marijuana in Defendant's left front pocket. Defendant was placed in one of the police vehicles.

A short time later, Officer Rains advised Defendant of his Miranda rights in a very abbreviated and hurried manner. This advice of rights was recorded on the DMVR. In response to interrogation by Officer Rains, Defendant stated that he bought the gun from "Chris" for $100.00. He also stated that he bought the gun for protection. Officer Rains pressed Defendant about whether he knew the gun was stolen. Officer Rains expressed disbelief that a Sig Sauer handgun could be purchased lawfully for such a low price. Defendant said, "It's wild, man." Officer Arpino searched Williams and located suspected marijuana and cocaine on his person.

Defendant contends that he was unlawfully seized because the officers did not have reasonable suspicion to approach the vehicle he occupied with Williams. Consequently, Defendant argues that any evidence obtained as a result of the illegal seizure should be suppressed. Defendant also argues that he was in custody at the time he was handcuffed, and any statements he made about the gun should be suppressed because he was not advised of his Miranda rights.

## II. ANALYSIS

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. Amend IV. Pursuant to the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot not used in a criminal proceeding against the victim of the illegal search and seizure." United States v. Calandra, 414 U.S. 338, 347 (1974).

Law enforcement officers are permitted to approach a person in a public place and ask a few questions. Florida v. Bostick, 501 U.S. 429 (1991); see also United States v. Flowers, 912 F.2d 707, 711-12 (4th Cir. 1990). "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions . . . the encounter is consensual and no reasonable suspicion is required." Bostick, 501 U.S. at 434. Police do not effectuate a detention or seizure merely by approaching an individual on the street or in other public places and putting questions to them. United States v. Jones, 678 F.3d 293, 299 (4th Cir. 2012). "[N]o seizure occurs when police ask questions of an individual, ask to examine the individual's identification . . . so long as the officers do not convey a message that compliance with their requests is required." Bostick, 501 U.S. at 437.

The protections of the Fourth Amendment do not apply to every encounter between a police officer and a member of the public. Even though such encounters may be uncomfortable to an individual, the Fourth Amendment comes into play only when a seizure occurs. United States v. McCoy, 513 F.3d 405, 411 (4th Cir. 2008). "Although many members of the public might feel uncomfortable when an officer approaches them in this manner and asks to speak with

them, uncomfortable does not equal unconstitutional." Id.

All of the circumstances of a police encounter must be considered to determine whether a reasonable person would have believed that he was not free to leave. Jones, 678 F.3d at 299. This is an objective standard. Id. The factors to be considered in determining whether a reasonable person would feel free to leave include, but are not limited to: (1) the number of police officers present at the scene; (2) whether the police officers were in uniform; (3) whether the police officers displayed their weapons; (4) whether the police touched the defendant or made any attempt to physically block his departure or restrain his movement; (5) the use of language or tone of voice indicating that compliance with the officer's request might be compelled; (6) whether the officers informed the defendant that they suspected him of illegal activity rather than treating the encounter as routine in nature; and (7) whether, if the officer requested some form of identification, the officer promptly returned the identification. United States v. Black, 707 F.3d 531, 537-38 (4th Cir. 2013); see also Jones, 678 F.3d at 299-300.

Defendant was a passenger in a vehicle parked behind a motel at 12:23 a.m. in a high crime area. There were two officers on the scence when Officer Arpino initiated contact with the driver. Two more officers arrived as back ups shortly thereafter. Officer Arpino spoke with the driver about the high incidence of crime and the reason for police talking with people in the area. Officer Arpino asked for identification from Williams. Williams and Defendant were not told that they were suspected of illegal activity. Officer Arpino's tone was conversational, and he did not seek to compel compliance. Given the totality of the circumstances, the undersigned finds that this initial contact by the police was a lawful voluntary encounter. A reasonable person would not have believed that he was not free to leave. This contact did not require

reasonable suspicion and did not constitute a seizure of Defendant.

"[W]hen a police officer during a voluntary encounter or otherwise 'observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot,' the officer may temporarily seize and detain a citizen." United States v. Black, 525 F.3d 359, 364 (4th Cir. 2008)(quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). To justify a Terry stop, "the officer must be able to articulate an objectively reasonable suspicion of criminal activity." United States v. Hernandez–Mendez, 626 F.3d 203, 207 (4th Cir. 2010), cert. denied, 131 S.Ct. 1833 (2011).

In assessing reasonable suspicion, the Court must examine "the totality of the circumstances." United States v. Foster, 634 F.3d 243, 246 (4th Cir. 2011). "The reasonable inquiry is fact-intensive, but individual facts and observations cannot be evaluated in isolation from each other." Hernandez–Mendez, 626 F.3d at 208. Thus, "[e]ven where each individual factor alone is susceptible of innocent explanation, the question is whether, taken together, they are sufficient to form a particularized and objective basis for an officer's suspicions." United States v. Black, 525 F.3d 359, 365–66 (4th Cir. 2008) (internal quotation marks and citation omitted).

The Fourth Circuit has held that "[r]easonable suspicion is a commonsensical proposition. Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993); see also United States v. Arvizu, 534 U.S. 266, 273 (2002) (permitting "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained

person'"(quoting United States v. Cortez, 449 U.S. 411, 418 (1981))).

Since the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not an onerous one. See, e.g., United States v. McCoy, 513 F.3d 405, 412-13 (4th Cir. 2008) (experienced officer's observation of vehicles parked briefly in store parking lot where drug sales had previously occurred, then moved to another nearby lot where drug sales had also occurred and where occupant of one vehicle got into the other vehicle for a short time, after which that vehicle left at a high rate of speed as officer approached, sufficient to constitute reasonable suspicion); United States v. Harris, 39 F.3d 1262, 1268-69 (4th Cir. 1994) (officer's observation of man leaving apartment in a vehicle after confidential informant advised drug delivery was imminent constitutes reasonable suspicion to stop vehicle); United States v. Turner, 933 F.2d 240, 242-44 (4th Cir. 1991) (officer with experience in narcotics investigations had reasonable suspicion to stop and determine whether subject was "cooking" illegal drugs after observing her carry cup of water out of convenience store, walk to car, and lean over front seat as if hiding something); United States v. Moore, 817 F.2d 1105, 1107 (4th Cir. 1987) (officer's nighttime observation of man walking away from otherwise deserted area where burglar alarm had just gone off constitutes reasonable suspicion to stop him). However, the officer "must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000).

Factors contributing to a finding of "reasonable suspicion" may include: (1) presence in a high crime area, United States v. Perkins, 363 F.3d 317, 320-21 (4th Cir. 2004); United States v. Christmas, 222 F.3d 141 (4th Cir. 2000), cert. denied, 531 U.S. 1098 (2001); United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993); (2) evasive conduct, United States v. Vaughn, 700

F.3d 705, 711 (4th Cir. 2012)(breathing heavily along with other signs of nervousness); United States v. Smith, 396 F.3d 579, 585-87 (4th Cir.), cert. denied, 545 U.S. 1122 (2005); United States v. Humphries, 372 F.3d 653, 657-60 (4th Cir. 2004); United States v. Tate, 648 F.2d 939, 943 (4th Cir. 1981) (attempt by subjects to hide their faces); and (3) lateness of the hour, Lender, 985 F.2d at 154.

Being in a "high crime area," standing alone, is not enough to constitute "reasonable suspicion." Illinois v. Wardlow, 528 U.S. at 124. However, it is clearly a relevant factor to be considered in the overall calculus. Id. Accord United States v. Black, 525 F.3d 359, 365-66 (4th Cir. 2008) (being in high crime area combined with other enumerated factors constituted "reasonable suspicion" to detain and frisk defendant); United States v. Mayo, 361 F.3d 802, 804-07 (4th Cir. 2004) (being in high crime area, combined with suspicious, evasive, and nervous conduct constituted "reasonable suspicion" and justified frisk for officer's protection); Christmas, 222 F.3d at 145 ("although [the defendant's] presence in a high crime area is not alone sufficient to justify a Terry stop, the fact that the stop occurred in a high crime area [is] among the relevant contextual considerations in a Terry analysis").

Applying these well established principles to the facts in this case, the undersigned finds that the officers had reasonable suspicion under Terry. Officer Arpino testified as to specific facts that, based upon the totality of the circumstances, demonstrated a particularized and objective basis for suspecting that criminal activity was afoot. Officer Arpino was aware of a pattern of criminal activity in the area where the Red Roof Inn was located. The officers encountered Williams and Defendant seated in a parked car behind the motel at approximately 12:23 a.m. Officer Arpino observed a baggie corner on the rear passenger floor board. In his training and experience, the baggie corner appeared to be drug paraphernalia. Officer Arpino

8

had almost six years of experience with the CMPD. Officer Thomas had seven years of experience with CMPD. Officer Rains had nearly fifteen years experience with CMPD. Both Officers Thomas and Rains had made drug-related arrests across the street from the Red Roof Inn. Finally, Officer Arpino noticed that Defendant was breathing very rapidly during the encounter. Based upon the foregoing, Officer Arpino reasonably concluded in light of his experience that criminal activity may be afoot.

Based upon that reasonable and articulable suspicion, Officer Arpino was justified in having Williams and Defendant step from the vehicle. An officer, having reasonable suspicion, may order a person out of a vehicle as part of an investigation. See Pennsylvania v. Mimms, 434 U.S. 106 (1977). When Williams stepped from the car, Officer Arpino detected a strong odor of marijuana. As Defendant exited the car, Officer Thomas observed that he was bent at the waist and reaching toward his right front pocket as if he were attempting to conceal something. Officer Rains saw Defendant push down against his right front pocket with his right hand. When officers make a Terry stop, they may take such steps as are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." United States v. Hensely, 469 U.S. 221, 235 (1985). Consequently, when Officer Rains took hold of Defendant's wrist, put his hands behind his back and handcuffed him, it was proper given the totality of the circumstances.

Defendant was in custody for the purposes of Miranda at the time he was handcuffed. A person is in custody for purposes of Miranda when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001)(quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984)). The relevant inquiry under Berkemer, is whether, under the totality of the

circumstances, a reasonable person would have understood his freedom of movement was restrained to a degree associated with formal arrest. 468 U.S. at 442. Courts have consistently held that handcuffs are indicia of arrest. See e.g., Dunaway v. New York, 442 U.S. 200, 215 (1979); United States v. Maguire, 359 F.3d 71, 79 (1st Cir. 2004); United States v. Bullard, 103 F.3d 121, 1996 WL 683790, at *4 (4th Cir. Nov. 27, 1996)(unpublished table decision).

While handcuffing Defendant, Officer Rains smelled an odor of marijuana about Defendant's person. Officer Rains then asked Defendant about the marijuana. At this point, Defendant had not been advised of his rights, and he was clearly in custody. Although this amounted to custodial interrogation, Defendant did not answer the question. Instead, Defendant made an unresponsive and spontaneous utterance. Defendant said, "I have a gun in my pocket." A statement that is unsolicited or unresponsive to an earlier question is deemed voluntary and, therefore, admissible. See, e.g., Miranda v. Arizona, 384 U.S. 436, 478 (1966)("[v]olunteered statements of any kind are not barred by the Fifth Amendment"); United States v. Wright, 991 F.2d 1182, 1186-87 (4th Cir. 1993)(same); United States v. Suggs, 755 F.2d 1538, 1542 (11th Cir.1985) (voluntary comments unresponsive to police questioning are admissible even after Miranda rights are asserted). The undersigned finds that Defendant's statement that he had a gun in his pocket was spontaneous and voluntary and therefore, should not be suppressed.

Following Defendant's spontaneous and voluntary statement, Officer Rains immediately asked him which pocket contained the gun. Defendant responded, "right." Officer Rains reached into Defendant's right pocket, and pulled out a Sig Sauer pistol. The undersigned finds that Officer Rains' question about the gun was proper under the public safety exception to Miranda. The Supreme Court has held that there is a public safety exception to Miranda. New

York v. Quarles, 467 U.S. 649, 655 (1984). The Court held that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." Id. at 657.

In Quarles, New York City police officers on routine patrol were approached by a woman who reported she had just been raped. She gave a description of the suspect and told the officers that he was armed and just ran into an A & P supermarket. The officers located Quarles and chased him to the back of the store. One of the officers apprehended Quarles, frisked him and discovered that he was wearing an empty shoulder holster. After handcuffing Quarles, the officer asked him about the whereabouts of the gun. Four police officers were present when Quarles was asked about the gun. Quarles nodded in the direction of some empty cartons and told the officer that the gun was over there. An officer then went to that location and recovered a .38 revolver. Quarles was then formally placed under arrest. Id. at 651-52.

As in Quarles, police handcuffed the Defendant here prior to asking him about the location of the gun. Officer Rains'question was not designed to elicit testimonial evidence from the Defendant. Rather, the officer asked about the location of the gun to secure his safety and that of the public. See id. at 659. In Quarles, the Court made clear that the public safety exception also applies to the safety of police officers. Id. The undersigned finds that the public safety exception to Miranda applies, and Defendant's statement to Officer Rains as to the location of the gun should not be suppressed.

After the pistol was removed from his pocket, Defendant made another spontaneous statement saying, "I just bought it today." That statement was not the result of any

interrogation. As discussed above, is not subject to Miranda, and should not be suppressed.

Defendant was finally placed in the back of one of the police vehicles. As documented on the DMVR, Officer Rains advised Defendant of his Miranda rights in a very hurried and abbreviated manner.

A defendant may waive his Miranda rights if he does so "knowingly and voluntarily." North Carolina v. Butler, 441 U.S. 369, 373 (1979). A two-step inquiry is necessary to determine whether a defendant effectively waived his rights under Miranda. First, the relinquishment of the right "must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception." United States v. Cristobal, 293 F.3d 134, 139-40 (4th Cir. 2002) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). Second, the waiver

> must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Id. at 140.

The undersigned finds that Officer Rains' purported advice of rights was inadequate to the extent that Defendant could not knowingly and voluntarily waive those rights. Consequently, the undersigned finds that statements made by Defendant after the inadequate advice of rights should be suppressed.

### III. **RECOMMENDATION**

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that the Defendant's "Motion To Suppress Evidence" be **GRANTED IN PART** and **DENIED IN**

**PART**. More specifically, suppression of Defendant's oral statements made in the police vehicle should be granted but otherwise the Motion should be denied.

## IV. **NOTICE OF APPEAL RIGHTS**

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within fourteen (14) days after service of same. Failure to file objections to this Memorandum with the District Court constitutes a waiver of the right to de novo review by the District Judge. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989). Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140, 147 (1985); Diamond, 416 F.3d at 316; Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Wells, 109 F.3d at 201; Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties; and to the Honorable Frank D. Whitney.

**SO RECOMMENDED.**

Signed: November 7, 2013

David S. Cayer
United States Magistrate Judge